SINGER *v.* ARKANSAS NATIONAL BANK OF
HOT SPRINGS, EXECUTOR.

4-8837                                    219 S. W. 2d 219

Opinion delivered April 4, 1949.

*House, Moses & Holmes* and *W. R. Roddy,* for appellant.

*Wootton, Land & Matthews,* for appellee.

HOLT, J. Della B. Singer died testate October 11, 1944. She left surviving her husband, appellant, now 73 years of age. Under the terms of her will, appellee, Bank, was named her executor. Appellee, May 29, 1945, brought the present suit against appellant for an accounting, alleging in substance that from about 1924 until the death of his wife, appellant, as trustee and agent, had handled her property generally, involving in excess of $750,000, had made investments in Government bonds and securities, kept bank accounts, and occupied a fiduciary relationship.

Appellant answered admitting that he had handled and managed his wife's property, but denied that in doing so he acted as trustee, agent, or in a fiduciary capacity and further denied that appellee was entitled to an accounting, in the circumstances.

The Court appointed Jacob L. King master to state an account, and on December 10, 1946, he filed his report.

July 9, 1948, after an extended hearing during which voluminous testimony was presented by the parties, the trial court found that appellant, Charles Singer, was not acting in the capacity of trustee of assets belonging to his wife from 1924 to 1944, inclusive. The court further found that appellant had not accounted for $18,910.74, and that he owed the estate this amount for which decree was entered for the executor, appellee.

The cause comes here on appellant's direct appeal and appellee's cross appeal.

As we read the record, the primary and decisive question presented is whether, in the circumstances, an accounting was required of Charles Singer, or whether Charles Singer occupied such fiduciary relationship to-

ward his wife that would give a court of equity power to require an accounting.

The material facts appear to be practically undisputed.

Della and Charles Singer were married in St. Louis, Missouri, in 1907. They moved to Hot Springs, Arkansas, in 1912 where appellant operated a tailoring business until 1923 when, at his wife's request, he sold his business. From the earnings of business and sale thereof he had accumulated approximately $18,000 cash. Shortly before this sale, Mrs. Singer, through her brother in St. Louis, had inherited a one-sixth interest in the income, during her life, from a large estate from which she had received in monthly payments at the time of her death in 1944, a total of $749,420.21. Prior to her inheritance, Mrs. Singer had no estate or income of her own and was solely dependent upon appellant for support. Immediately following her good fortune and during all the years from 1923 to October 11, 1944 (when Mrs. Singer died), they had commingled and mixed all their assets, which at Mrs. Singer's direction, and with her consent, appellant handled generally. He made purchases of Government bonds with her knowledge and consent, not only for her but for himself. He opened ten joint bank accounts in various banks in and out of Arkansas, rented lock boxes in their joint names, wherein he stored bonds and assets. From Mrs. Singer's funds he built their home in Hot Springs at a cost of approximately $60,000, purchased automobiles, hired a chauffeur, servants, nurses when needed, spent vacations in Florida and made trips to California. When they moved to Hot Springs, Mr. Singer was suffering from arthritis and Mrs. Singer was a semi-invalid, though always mentally alert, much of the time after their removal to Hot Springs and until her death.

No complete record was kept by appellant of all moneys that passed through his hands, except bond purchases and other investments, for the reason that his wife consented to the manner in which he was handling her money and required no such completed record, or accounting.

The record discloses that their married life was harmonious and congenial, and pictured a couple devoted, happy, and with each holding the absolute trust and confidence of the other.

The record is devoid of any suggestion of fraud, overreaching or undue influence on the part of Charles Singer or of any mental incapacity on the part of his wife. Following her death, appellant coöperated with the executor to the fullest extent. He readily disclosed and produced all assets which had come into his hands which he held, as indicated, in Arkansas and outside the State. He aided the executor in making a complete inventory of these assets and about the 24th of April, 1945, he made a settlement with the executor of his interests in his wife's estate, which settlement had not been questioned until the present suit for an accounting was filed. True it is that appellant handled more than $750,000 of his wife's money over the period from 1923 to 1944, but it is undisputed that she permitted him to do so without restraint. She also made gifts to him of large sums of money, and required no accounting from him, which obviously she had the right to do if she so desired.

When Mrs. Singer made her will, June 2, 1944, she gave her husband the home with its furnishings, $100,000 in cash, and after a large number of other bequests, she provided that her executor pay to her "beloved husband," during his life, the net income from her trust estate, and in addition that he pay all hospital and medical bills of her husband, and if necessary to use the principal for such purpose. She further stipulated in her will: "I appreciate that my husband is fully competent to fully handle and manage my estate, but it is my wish and desire that my husband, for the remainder of his lifetime, will not be burdened with the care and management of business affairs," and further "it is my will and desire that in the performance of the management of my estate and in the sale and purchase of assets, including the transfer thereof, that said Trustee will freely consult and confer with my beloved husband, to the end that he will, at all convenient times, be informed

of such management, and in return therefor the Trustee will receive the benefit of his good advice.''

The Master's report did not purport to be a complete report and accounting of all moneys, receipts and disbursements handled by appellant for the simple reason that he could only work from such records as appellant kept. Obviously he could not make an accurate accounting and audit when appellant was not required by his wife to keep complete records or to account to her. The Master testified that it was not possible for him to make an accounting with any degree of accuracy whatever with the records that he had and that he made no attempt to set up in his report the amount of money that Charles Singer received from his wife.

He further testified that in his efforts to state an account, no transactions or items of $200 or less, were considered. The number, or total, of such items was not shown.

Robert B. Wilson, an employee of the auditing firm of Russell Brown & Company, also attempted to make an audit and accounting, and he tended to corroborate the Master's testimony. He testified that as a matter of fact, he could not certify a balance sheet on his report, neither could he give a positive statement to the court where he could certify it to be correct due to the lack of information and records.

Of much significance in this case is the fact that all beneficiaries and parties having any interest in Mrs. Singer's estate and who were made defendants to this suit, answered appellee's complaint denying appellee's alleged right to an accounting, and alleged that they were opposed to this litigation and prayed that appellee's complaint be dismissed.

In the circumstances, and after consideration of all the testimony, we have concluded that an accounting was not warranted, that while the trial court correctly held that Charles Singer was not acting as trustee of assets belonging to his wife from 1924 to her death in 1944, there was error in the decree directing an accounting. The most the testimony shows is that appellant was his

wife's agent in the sense that he followed her directions and acted with her consent, and was not acting in a fiduciary capacity.

"The duty of an agent to account . . . arises, not from the bare relation of agency, but rather from the fiduciary character of the relation between the parties, which character forms the basis for equitable interposition and gives the chancery court jurisdiction of a suit by the principal." 2 Am. Jr., § 286, p. 226.

"Where principal, expressly or by implication, has led liquidating agent to believe that he would not be required to account, or that particular method of accounting would be satisfactory, principal cannot complain that agent, acting in good faith, has not kept accounts with strictness which might otherwise have been required." *Pennsylvania Trust Co.* v. *Billman, et al.*, 61 Fed. 2d 382, (Headnote 3).

In the well reasoned case of *Barnett* v. *Kemp*, 258 Mo. 139, 167 S. W. 546, 52 L. R. A. N. S. 1185, in which the facts are, in effect, similar to those presented here, and the reasoning sound, the principals of law are well stated and apply with equal force here. We quote somewhat extensively from that opinion.

"To sustain an action for an accounting, some such business relation must be shown to have existed between the parties as to create a liability on the part of the one to the other. More briefly, the basis of the action must be the existence of the relation of principal or agent, in some one of the varied forms of business activity under which one, being authorized, acts for and on behalf of another. In fact, no form of human action, save by the actor himself, is possible without the creation, although it may be for the one act alone, of the relation of principal and agent. It was created and existed between defendant and his mother. So well defined was the relation that he did not rent an acre of ground, reset a fence, sell a crib of corn, or a stack of hay, except under her direction and with her approval. That he received and paid out money for her in conducting her business as we do not doubt, although there is a paucity of testimony in

this regard. In the absence of an express appointment, or acceptance, much may, of course, be inferred as to the nature of a business relationship from the words and conduct of the parties and the correlative circumstances connected with the case. We have weighed all of these in an effort to determine whether the relation which existed between these parties was such as to create a liability on the part of the defendant. The fact that the relation of principal and agent may in form have existed in this case lends no force to plaintiff's claim, unless it be shown that a liability was thereby created on the part of defendant.

"The property, real and personal, belonged to the mother. Her mental alertness and the exercise of her authority in regard to it, shown by the testimony, we have adverted to. The mother being dead, the son's mouth is closed as to the nature of his relations with her, and the evidence in regard thereto, in the absence of other witnesses, must be gleaned from her conduct, so far as it can be shown by all the facts and circumstances in the case. While he acted for her, and she kept a watchful eye upon his actions, she required him to keep no books, and if he accounted to her it must have been orally after each transaction. If he was required to make settlements, the conclusion is almost inevitable that they were made after the same manner as his reports. No syllable of testimony indicates that she was at any time dissatisfied with this manner of proceeding, and it is almost proof positive that if dissatisfaction existed the ever open ears of the village gossip would have heard it from her at some time during the 20 years and more that the relation existed. Under this state of facts, in the utter absence of evidence to sustain it, we are asked by the plaintiff to require the defendant to do what was never required of him by his mother, viz: Render an account of his transactions.

"Living, Mrs. Sarah Kemp may have been unbusinesslike in her methods, but her power to do with her own as she chose cannot be questioned. If she chose to give her income or more to her son in exchange for a home and the companionship of those endeared to her by

association and ties of blood, a court of conscience, whose decrees should be tempered by sentiment as well as a wholesome sense of right, should not interfere with her choice. Especially is this true where, as in this case, there is no allegation of fraud, unfair dealing, or undue influence, and no intimation that she was not, at all times, of sound mind. The plaintiff's petition is to be commended in this respect, as, after the necessary formal allegations, it plants its plea for a decree upon defendant's mismanagement of the estate. In our opinion, the facts and circumstances do not justify equitable intervention. Precedents in support of the conclusion reached here in regard to an accounting may be found in the following cases: *Donovan* v. *Griffith,* 215 Mo. 149, 114 S. W. 621, 20 L. R. A., N. S. 825, 128 Am. St. Rep. 458, 15 Ann. Cas. 724; *Smith, Admr.* v. *Perry,* 197 Mo. loc. cit. 461, 95 S. W. 337; *Crowley* v. *Crowley,* 167 Mo. App. 414, 151 S. W. 512; *Carrau* v. *Chapotel,* 47 La. Ann. 408, 16 So. 873; *Evans* v. *Evans,* 42 Tenn. (2 Cold.) 143; *Fidelity T. & T. Co.* v. *Weitzel,* 152 Pa. 498, 25 Atl. 569; *McCarty* v. *McCarty's Admr.,* 11 Ky. Law Rep. 366; *Rich* v. *Austin,* 40 Vt. 416; *Maccauley* v. *Elrod,* 28 S. W. 782, 29 S. W. 734, 16 Ky. Law Rep. 549; *Hamilton* v. *Hamilton,* 15 App. Div. 47, 44 N. Y. Supp. 97, 102; *Robbins* v. *Robbins,* (N. J. Ch.) 3 Atl. 264.''

This Barnett case was cited, and quoted from, with approval, by the Supreme Court of Michigan (9-5-39) in the case of *Grand Haven State Bank* v. *Prendergast,* 290 Mich, 206, 287 N. W. 435, where it was held: ''Deceased's intimate associate who, before deceased's death, handled deceased's business affairs, would not be required to account, on deceased's death, where no undue influence, fraud, or misrepresentation was exercised on deceased, all expenditures were with deceased's consent and approval, and satisfactory accountings had been made to deceased from time to time up until his death.''

The Supreme Court of Oklahoma in the case of *Winter* v. *Klein-Schultz,* (1-18-38) 182 Okla. 231, 76 Pac. 2d 1051, also approved and cited this same case.

We conclude, therefore, that on direct appeal, the decree should be and is reversed and the cause is dismissed. On cross appeal, the decree is affirmed.

The Chief Justice dissents.

GRIFFIN SMITH, Chief Justice, (dissenting). Under fuller facts than those appearing in the majority opinion, I dissent, agreeing with the Chancellor that an accounting should be made.

The statement that Mrs. Singer, by her will of June 2, 1944, ''. . . . gave her husband $100,000 in cash . . .'' is incomplete. The essential part of Item II reads: ''It is my will and desire that my husband shall receive from me during my lifetime or from my estate after my death, a total sum of $100,000. In [the] event I have not given to my husband said sum . . . during my lifetime, then I give and bequeath to him such additional sum to be paid from my personal estate as when added to the sum, or sums, given to him during my lifetime, will total the said sum of $100,000.''

Here, it seems, is a clear expression of Mrs. Singer's intent that the husband should be accountable for any moneys he had handled for her, other than incidental bounties mentioned in the will, and not questioned. All of the evidence shows that appellant had received substantially more than the hundred thousand dollars.

To me it seems illogical that we should add a judicial post script to the will, the effect of which is to hold that while Mrs. Singer was rational in all respects affecting testamentary capacity, and that undue influence was not exercised, still she really didn't mean what is so clearly shown.

On the main issue of a full accounting I am not prepared to express an opinion. Certified public accountants made partial findings from which the Chancellor drew conclusions and rendered judgment for $18,910.74. I do not think any one, situated as we are, can (in the limited time the case has been under submission and without neglecting other work) say that in point of mathematical computations there was error. We must

presume—and the result indicates—that the Chancellor spent whatever time was necessary to a consideration of the involved details. Before affirming or denying the result he reached, an appreciable period of time would be required for making a "set-up" from the record and checking thousands of entries, item by item. Since the majority finds that the testatrix did not intend that appellant should account for the money he handled for her, but that all such transactions were gifts, irrespective of the limitation of $100,000 fixed in the will, I express no opinion regarding what should be due.